Good morning, Your Honors. I'm George Wall representing Angel Mattson, and this is an appeal to the Commissioner's decision finding that she is not disabled. The ---- Why don't you just give us a little background? Okay. This was an administrative procedure, and the administrative law judge took all the evidence, weighed it, and said my client was not disabled. I'm here for Angel to say, of course, that she is. She, at the time of her application, was 45 years old, had a 70 ---- has a 70 IQ, serious neck problems, low back problems, asthma, and more, most significantly, a condition called Dupuytren's contracture, which means her hands can't quite grasp. So these ---- these matters are decided by weighing both medical and vocational evidence as to whether or not she can work. The basic question is, can she get up, go to work, 8 hours a day, 5 days a week? And that's what we're here to argue about. This is a Social Security disability matter. That's correct. And why is it that you're just ---- are you limiting your claim to SSI? Yes. She never worked long enough to earn the credits to qualify for Social Security disability. There are two programs, and if you work basically 5 out of 10 years before you become disabled, you're eligible for Social Security disability. If you have never worked, then you're eligible for SSI, which is also need-based, and your resources and income must also be limited. So this is SSI only. Well, how many years has she worked? I don't think, cumulatively, she ever worked a total of 5 years in her life. In her whole life? Yeah. Because I've never seen one like this before, where it was just a request for SSI. Well, there was one many, many years ago, but that involved Holocaust survivors. Unfortunately, I'm seeing a lot more of those folks who have never worked and who I think can't work. So there are many more. Probably you'll see more in the future. Counsel, I'm curious about your views on ---- it seems to me that the heart of this claim has to do with the administrative law judges, the ALJ's decision about how much weight to give to the treating physician. Could you address that? Yes. Dr. Margolis treated claimants since about 2005. The ALJ decision was in 2009. The basis for Judge Say rejecting the treating physician were evaluations done at Social Security's request in 2006. So there was no newer evidence after 2006 to rebut what Judge ---- I'm sorry, what Dr. Margolis said. And then the ALJ also found the claimant not completely credible, but the day after the hearing, she had surgery to release her contractures, and two months later was still having trouble with her hands. So the ALJ did not, we think, did not give Dr. Margolis the weight that he should have. And perhaps for the benefit of your future colleagues who are with us in the courtroom this morning, Dr. Margolis was the treating physician. That's correct. Who all else being equal would be entitled to his opinion will be entitled to greater weight. Yes.  And that's based on the record alone and sometimes based upon an examination. Yes. There is a treating physician. There are examining physicians who see person, people one time, and then there are physicians who make, express an opinion purely based on a record review. And each is accorded more weight kind of depending on how much contact they've had with the client. Why was the ALJ wrong in giving less weight to Dr. Margolis's opinion? Because there was nobody else in that 3-year period prior to the hearing who had taken any contrary position, and claimant's condition got worse over that period of time. So there was really no evidence from either a non-examining physician, a consulting examiner, to say that she did not have these conditions and the severity that she could not work. I guess there were other doctors, though, not the treating physician, that I guess opine differently than Dr. Margolis. Is that correct? Yes. So the question is why, when that happens, I guess the ALJ has to give specific reasons. Is that right? Right. Why weren't his reasons specific and legitimate reasons? His reasons were very conclusory. Basically, he said, I don't think Dr. Margolis, I just don't believe Dr. Margolis. And he did not address, say, Dr. Webster or the other people who had examined the claimant earlier in contrast with what Dr. Margolis said. In other words, he just kind of said no. He did not weigh the evidence. He just dismissed Dr. Margolis. Didn't he find that there was discrepancy between Dr. Margolis's opinion and the entries in Dr. Margolis's records? Yes. But what he said, there was no clinical or laboratory evidence to support Dr. Margolis's opinions. The claimant had x-rays that showed that she had severe degenerative disc disease in her neck and her low back, so the judge didn't take that into account. Dr. Solomon, the hand surgeon, had seen her as early as 2007 and said she needed surgery to release the D-petraneus contracture, and he didn't take that into account. He basically just said, well, I don't believe Dr. Margolis. But there was a hand surgeon's report. There were x-rays to substantiate claimant's conditions. The ALJ referred to Exhibit 26F in considering the medical test that Dr. Margolis had consulted, but I'm concerned that there were other tests that may have been considered by Dr. Margolis, including radiology reports regarding the degenerative disc disease in particular. If I look at these excerpts, it seems to me at 937, 945, there are additional indications of tests that were reviewed by Dr. Margolis, and those include the films of her degenerative disc disease. Is that correct? Correct. All right. Is the problem that that's how the record looks to me, as though Dr. Margolis had that foundation for the opinion that he gave regarding her disabilities. Is the problem that Dr. Margolis didn't make that clear in his report to the ALJ, or how was that missed? What can you tell us? I am not sure why the judge discounted that and did not address that. Was there conflicting testimony that was given greater weight? Is that the problem? Yes. Dr. Rosenbaum, who's a neurologist, had seen her again in 2006 and done nerve conduction studies and. That's for her hands. For her hands. And also on her elbows and strength tests and said she has no signs of cubital tunnel or carpal tunnel. But again, we were looking at this Dupuytren's contracture rather than carpal tunnel syndrome or cubital tunnel syndrome. Well, we've got several different disabilities going on here. But as to the degenerative disc disease, did the more recent, not the treating physicians, but the examining physicians hired to give expert testimony look at the same radiology reports that Dr. Margolis had relied upon? We don't know that they had those reports at all. It does not look like from Dr. Webster's report. Dr. Webster was the consulting examiner that saw her early on. It doesn't look like. We're not sure what he was given by DDS. In other words, he did not enumerate what he was given. Thank you. What about Dr. Margolis's notes? They were quite extensive, weren't they? Yes. And what period did they cover? Dr. Margolis first saw her in 2005. So the notes start from 2005 and run up to the hearing in 2009. So he has about four years' experience with her. Does the record show that those notes were available to the ALJ and that the ALJ commented on those notes or considered those notes? Those notes were available, and the ALJ went through the record, but for his own reasons gave less weight to those and to Dr. Margolis than to the consulting examiners. Let's assume we agree with you that the ALJ improperly discounted Dr. Margolis's opinion. Should we send this case back to the ALJ to determine whether your client's hand surgery had a positive effect on her functional capacity, or what do we do? Two and a half months after the hand surgery, she was evaluated by the occupational therapist who said she still has significant limitations in use of her hands. Those at the hearing, I posed that to the vocational expert who said with those limitations, the only job she could do would be ironer, for instance. Ironing or working on a bakery assembly line. Bakery conveyor line, which would require continuous standing, which is sort of. Dr. Margolis opined that just looking at the back condition, the degenerative disc disease, she would be limited to less than four hours a day of standing or walking. So if that testimony is credited, could she do either of the jobs that you just identified? She could not do the bakery worker job. The vocational expert testified she could do the ironer job, which is basically somebody working in an industrial laundry feeding items through an ironer. Okay. But she can't do that if she has the problem with her hand? Right. That's correct. The case has been thoroughly briefed, I think. I just would ask you to consider the weight that should be given to Dr. Margolis's report and his opinion on her limitations, and in our opinion, of course, we think it takes her out of the workforce and makes her unable to work. He was a treating doctor. He was a treating doctor. Okay. And what were his conclusions? What were his findings? He said that she can't stand more than four hours total in an 8-hour day. She can't lift more than 15 pounds occasional, and occasional in this forum is up to one-third of a day. She can't bend, twist, crawl, climb, crouch, or stoop. She's left-hand dominant, but her left hand is worse, and she can't use any more than her left hand for more than occasional grasping. And then he also went into her psychiatric conditions and said that because of her depression and her low borderline intellectual functioning, she probably would not be able to get to work on a regular basis at all, period. You had to have the employer had to really take into account that there'd be a couple of times each month that for whatever reason she couldn't show up for work. That's right. And that's the lower the skill level of the job, the less flexible the employer is. In other words, if you're doing basic production work, you have to show up every day on time or they'll find somebody else to do the job. So that alone would take her out of the workforce. And what about her mental functioning? She has been tested at a 70 IQ. She's had survived, I think, through a number of ‑‑ has been supported by a number of abusive husbands and boyfriends. She has ‑‑ Been a homeless woman? Homeless for part of the time. She's, you know, she's been reported to be cutting on herself. She's had some ‑‑ I don't think she's ever been hospitalized for a suicide attempt. Was she a razor, a cutter? Yes. She's been a cutter. And what happens is she sort of stays in her place. She fortunately has housing now. She's got a place to live and she pretty much stays there because she doesn't like to go out and be around people or deal with any social situations. She has some history of alcoholism, but she stopped drinking. Actually, she stopped smoking, and her asthma is not any better since she stopped smoking. So she's got quite a bit of health. Where is she living now? She's living out in East County. She's got a grant from the Housing Authority for Section 8 housing. Oh, she's got Section 8? Yes. Food stamps, Section 8 housing, and now she has Oregon Health Plan, so she's got coverage. And support services at that facility? She's connected to an organization called JOIN, which works to help her stay in housing, deals with problems she has with her neighbors or other things that come up that might want her to go back and be homeless. So she has some support. They're trying to keep her from going back on the streets.  And, you know, with housing, her life is much better. Does she have any family to help her? No. No. Where was she born? She's born here in Portland. In Portland. And, yeah. And she's lived here all her life? Yes. All right. Thank you. All right. It is sad. And unfortunately, I think we're seeing more of those. So, all right. Thank you. Thank you. May it please the Court. Lars Nelson on behalf of the Commissioner of Social Security. Your Honor, the Commissioner asked this Court to affirm the decision. How is the Commissioner these days? She is an acting Commissioner. And she is doing the best that she can with the funds available, Your Honor. We are in the business of adjudicating disability and retirement benefits and Medicare. And, of course, we have limited resources, but the checks still go out on time, Your Honor. And we adjudicate these proceedings in as timely a fashion as possible. So who's cutting back on your money? Across government, Your Honor, there is obviously a shortfall. And so, like sequestration, the Commissioner is subject to that as well. But we continue to do an excellent job. And our acting Commissioner is fulfilling the promise of President Roosevelt when he set forth the Social Security Administration. Counsel. The ALJ found in this case that Dr. Margolis failed to show significant clinical and laboratory findings to support, provide the foundation for his opinion, that she couldn't work full-time, that she may not work full-time, and that she would miss work twice a month. And to me, this seems to be the heart of the case. So to make sure that you have a chance to answer my question, the problem I have is that the ALJ cited this Exhibit 26F, and yet the record tells me that Dr. Margolis considered considerably more than that, including some radiology reports that I have referred to in my questions to opposing counsel. I want to make sure you have a chance to respond. Yes, Your Honor. To that, there is no dispute as to what her diagnoses are. And 26F speaks to her diagnoses. The other reports that Dr. Margolis considered were some ER visits, Dr. Jensen. And some radiology films. And some radiology films. But there is no dispute. That showed degenerative disease. Yes. But there is no dispute that she has degenerative disc disease and a disc space narrowing of her lower back. Well, we probably all have degenerative disc disease because we're all over 50. So it's all a question of degree, right? Correct, Your Honor. Right. So the extent of that degenerative disc disease is critical in this case, as it is in many of these cases. Hence my concern that the record looks to me like Dr. Margolis was the medical expert, although I use that term incorrectly, treating physician, but of the physicians who opined in this case, it looks to me like he's the guy who did see the films and that your experts did not. Please correct me if I'm wrong. Yes, Your Honor. If you look at 641, Dr. Jensen, who was the consultative examiner,  I know we're talking about the same films. I believe that was the 2003 x-ray, which was the primary one. The administrative law judge did discuss the 2007 films, and I believe he discussed those at the bottom of page 17 or 18. Am I wrong in having the impression, you know, it's always hard on appeal because we weren't at the actual proceeding, but to me this record seems to be that the ALJ primarily discounted Dr. Margolis' opinion, sort of for two reasons. One is that the ALJ was of the view that Dr. Margolis didn't have adequate laboratory or test results to support his opinions, and the other seemed to me to be a comment that Dr. Margolis' treating notes didn't necessarily indicate all of the disabilities that the claimant now claims. Is that a fair summary? That is a fair summary, Your Honor. Okay. If that's the case, then let's talk about the last one first, because a treating physician, it seems to me, reflects in the notes whatever the patient comes to see him or her for that day, but doesn't necessarily catalog all of the problems a patient might be having the way an expert would if providing an expert opinion, right? So I'm wondering why that's a fair reason to discount Dr. Margolis' opinion. Well, Your Honor, first of all, if you look at Dr. Margolis' opinion, what's missing from it is a thorough examination at the start of seeing his patient, Ms. Mattson. I would assume to me that if you come and start seeing a doctor, there would be a thorough examination at the start of that, or once you're in, because he saw her for almost three years, once you're into seeing that doctor, the doctor would schedule a full physical. In fact, the doctor did review her diagnoses. There's no dispute that Dr. Margolis was well apprised of what her diagnoses were. The difference is that his reports failed to reveal the clinical examinations to support his opinions. And I think the best contrast is with Dr. Webster. Obviously, Dr. Webster was a consulting physician who performed a more detailed analysis. But if you look at Dr. Webster's opinion, it contains some very basic observations, just her ability to get on and off the examining table, her range of motion, he tested her motor strength, performing a very detailed exam. Well, he saw her for a total of 25 minutes, right? Yes, she, Kim Webster saw her for just a brief examination, Your Honor. Oh, I guess I don't know if Kim Webster is a female or a male doctor. Forgive me if I got the pronoun wrong, but the more important point is I want to make sure I'm not missing. This was one 25-minute exam? Correct, Your Honor, but a very thorough and detailed exam, an exam that included testing her ability to pick up coins off a table, having her close her eyes and identify what was in her hands, testing whether she could tie a shoelace, as well as range of motion for her lower back. Dr. Webster observed that she was doing inconsistent and poor effort in her motor strength skills, sometimes trying hard and sometimes not trying hard at all, as well as positive waddle signs showing that there was not an organic source to her back pain. Although Dr. Webster was aware that she had degenerative disc disease, Dr. Webster wasn't able to observe any limitation from that degenerative disc disease. And if you look at Dr. Margolis' reports, which are very sparse. Dr. Webster in the 25 minutes couldn't observe it. That's what he says, I mean, she says in the report. Well, I mean, aren't we, I mean, the ALJ was weighing Dr. Webster versus her treating position, which I think the law says we have to, or the ALJ has to give deference to the treating physician. Is that right? And if they don't, they have to give specific and legitimate reasons why not. There is a presumption, Your Honor. However, that's the treating physician's opinion under 416.927 is only entitled to controlling weight if it is consistent with other records, other medical records, and supported by the clinical and laboratory findings. And is that your best argument, that the Dr. Webster evaluation is not consistent with the three years of examinations and notes that the treating physician had? Well, no, Your Honor. If you look at Dr. Margolis' actual reports, where Dr. Margolis does perform examinations, there's a test for a lower back tenderness, the CVA, that's the costovertebral angle in your back, which is from your lower of your ribcage down your spine. He tests her costovertebral angle on multiple occasions and observes no tenderness. You would think if Dr. Margolis was going to opine that she has back pain that limits her, some point in the record there would be a test where he says, yes, I touched her back, her lower back, and she reported pain, and that's not the case. You know, he was good enough to take care of her for 5 years, right? A little less than 3 years, Your Honor. But, yes, he was her treatment about once a month. Whatever it was, she had a doctor who was concerned about her. Would you say that? Yes, Your Honor. Yes, okay. Now, didn't he determine that she had moderate to advanced degeneration of L5 to the S1 disc? Yes, and so did the ALJ, Your Honor. And she had advanced degeneration of C5 to C6, C6 to 7 disc space with considerable height loss. In other words, she shrank. Yes, and that is discussed by the ALJ at the bottom of 17. That's what he found. And she also had osteophytic spurs on her lumbar, on her spine. Yes. And, again, that's discussed by the ALJ at 17. Okay. And the expert she was sent to, he's used by the Social Security Administration rather frequently, right? I don't know what the frequency. Did you check that out? Because the Social Security's rate for examinations tend to be lower than the doctor's normal hourly rate, we rely on these doctors who kind of out of their sense of charity performs this work. I'm not seeing his record on that. No, and I don't have it in the record. I just asked you if he is frequently used. You don't know. I do not know, Your Honor. I don't know whether that's part of his job. He brings people in. He gives them an exam. He writes a report. You don't know that. And, Your Honor, I would direct the Court to page 912 and 910 of Dr. Margolis' opinion. The other thing the ALJ noted is that her back pain was treated conservatively with Flexerol and Percocet. And on 912 and 910 of Dr. Margolis' opinion, Dr. Margolis notes that these painkillers, these are helping her back pain, and she's actually requesting more. As far as her mental impairment. So what about that? Well, just taking Percocet and Flexerol for occasional back pain is a conservative treatment, suggesting that although she has degenerative disc disease, obviously this varies between people. But you have to give them conservative treatment. If you keep giving them a lot of those pills, they're going to have problems with their liver. They're going to have problems with other organs. And the modern thinking today is that we waste a lot of money on these extensive physical exams. You know that? We waste a lot of money. If the doctor wants to make a lot of money, he gives you a total physical exam, and what are you going to do with it, huh? Margolis gave her good treatment. He cared for her. He was concerned about her. Counsel, I heard you reference moderate degenerative disc disease a couple of times, I think. And I actually have that in my notes somewhere. But I also have in my notes that at ER 959 it's described as severe. And that is an X-ray radiology report of November 6, 2006. My question is whether Dr. Kim Webster had access to or considered the November 2006 X-ray. I don't believe the record supports that she reviewed the X-rays. She was aware of the diagnoses, Your Honor. As far as the deputant's contractures, I think we can also look to Dr. I think it's called Dupre-Tenz. Dupre-Tenz. As far as the contractures are concerned, Your Honor, I think we can also look to Dr. Solomon's reports, Dr. Rosenbaum's, and Dr. de la Cruz's reports, who did perform the clinical examinations and found that she only had mild degenerative disc disease. And if you look in Dr. Margolis' reports, her surgery is described as plastic surgery for her hands. And Dr. Webster said in her experience she had never seen pain symptoms come from these contractures. And, in fact, no doctor could describe a source for her described hand pains. Did Dr. Webster have her entire medical file? That's not in the record that I'm — I mean, was she aware of all the other — I mean, the depression and everything else? Do we know? Is it in the record? I believe that would be Dr. Klotz, because Dr. Webster was only performing a physical exam. And — That's, I guess — I mean, some of these positions, I think there was a Dr. Dickinson as well. Is that right? Correct, Your Honor. He was the psychiatrist or psychologist? He was an examining psychologist on an earlier application. So that was before the relevant period, which is 2006 when she applied to 2009. But I don't think he had all of her records either, though. Well, his record is consistent with the records that she does not seek mental health treatment. She actually declines treatment for her depression multiple times with Dr. Margolis. And he asks if she wants to start the reuptake inhibitors, and she declines that. And so Dr. Dickinson's record forms, I guess, the body of her mental health background. And Dr. Klotz's opinion is from the relevant period, and Dr. Klotz diagnosed her with post-traumatic stress disorder but opined that this did not cause any limitations. And when you look at Dr. Margolis's opinion, you see that whenever he looked at her mental health records, that she was alert and oriented and she was in no acute distress. And I believe that my time has passed, Your Honor, so unless the Court has any further questions. Don't go away. I want to ask you a few more questions. Now, the vocational expert came up with job numbers for conveyor-line bakery worker of 9,847 and ironer at 29,475. And these are the numbers in the national economy. Now, do you know where those numbers came from? Yes, Your Honor. There are quarterly surveys that are done, and so that those numbers are accurate as surveys as of the time that the vocational expert testified, whatever quarter was the most recent survey performed. Well, have you checked these numbers out yourself? To determine if they're accurate today or? Yes. To determine if they're accurate when we had this hearing. No, Your Honor. Like the ALJ, I relied on the vocational expert's testimony. It seemed to me that those were high numbers, and I couldn't find where those numbers came from. And I asked two of our librarians to see if they could find those numbers. They couldn't find them. I checked with the Bureau of Labor Statistics. They couldn't find them either. And now, conveyor-line bakery worker and an ironer are listed under a larger occupation by the Bureau of Labor Statistics called production workers, comma, all others. In 2008, the Bureau of Labor Statistics that had this larger occupational title had 280,160 jobs in the national economy. And under conveyor-line bakery worker and ironer, I mean, this was part of that big group. The best I could find, there were 1,590 jobs in this larger title. And there's an average of 176.2 positions for the other titles. That's why I wonder where all these numbers are coming from. It's like we're playing a numbers game. Well, this was actually a vocational rehabilitative counselor, Your Honor. And Your Honor spoke about helping people before, and that's kind of her role. And both these positions, especially for the ironer, she testified that she's seen this position in action. And on paper, Ms. Margolis and Ms. Mattson can perform her previous work. I'm not asking you that question. I just want to know where these numbers come from. They come from different places, some the Department of Labor, and they also are private agencies that do surveys, which the vocational experts If I wanted to check their accuracy, wouldn't you think I'd want to go to the Bureau of Labor Statistics? Well, that would be someplace, Your Honor. But unfortunately, we have a closed administrative record. So where do you find those? Well, they are a product of the vocational expert's expertise. And that came about, I believe, in the 80s from a Second Circuit ruling saying that there was not evidence in the record and we couldn't use just raw data, that we had to have experts' testimony. So this is a factual issue. And because we have a closed administrative record, Your Honor, we are kind of left with the vocational expert's testimony. And there was no objection to her qualifications. I'm just asking you a question. I'm trying to learn where you get these figures, where they come from. And you really can't tell me. Well, I know they use various software. It's a lot of things, but tell me how I can get these numbers. Well, one reason why the numbers would be boiled down from the larger Department of Labor numbers is the vocational expert is calibrating the number of possible jobs that might be in a category to Ms. Mattson's unique vocational skills, her residual functional capacity, her age, the transferability of her skills. So the vocational expert sits between the Commissioner's regulations and the Department of Labor's regulations as well as the numbers. And that's our expert we use to translate the residual functional capacity. Do you have a report from that expert that came up with the 9,847 and the 29,475 for an ironer? Do you have a piece of paper? No, Your Honor. That's all. We don't. If there's no other questions, thank you, Your Honor. Thank you. Thank you. I used up all my time in opening, so I will answer any more questions or I can address some of the questions you raised, if you like. I have seen a number of Dr. Webster's reports. He is commonly used here in Oregon. And as Mr. Nielsen says, because the State pays so little, it's hard to find physicians that are willing to do these evaluations. And I do note that the question is what did Dr. Webster have before him, and his record says, review of records, quote, we have a couple of chart notes. End quote. That's page 5. A couple of what? Chart notes. That's what he said. And that was two months after the claim was made, and we don't know what the State DDS provided him. That last word, charges? Chart notes. Oh, chart notes. Yes. And with regard to your question about the vocational numbers, I was once a vocational expert. I went to my local State employment division, and I got numbers by jobs as best they could tell me. So those are derived from State numbers. They are very soft, but as good as we have in terms of the evidence. All right. Thank you. All right. The matter is submitted.
judges: Pregerson, Murguia, Christen